**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

SLEP-TONE ENTERTAINMENT
CORPORATION,

        Plaintiff,

v.

Willie Leigh d/b/a Big Ed Productions and
Lacoco Pizza and Pasta, Inc., an Illinois
Corporation

        Defendants.

Case No.: 14-CV-10008

## COMPLAINT

The Plaintiff, Slep-Tone Entertainment Corporation ("Slep-Tone"), by its undersigned

counsel, hereby complains of Defendant Willie Leigh d/b/a  Big Ed Productions and Defendant

Lacoco Pizza and Pasta, Inc. and for its Complaint hereby alleges as follows:

### JURISDICTION AND VENUE

1.      This is an action for trademark infringement and unfair competition arising under

15 U.S.C. §§ 1114 and 1125.  This Court has exclusive jurisdiction over the subject matter of

this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the

United States.

2.      This Court further has jurisdiction pursuant to 28 U.S.C § 1338(a), in that this

civil action arises under an Act of Congress relating to trademarks, and, as to Slep-Tone's

Lanham Act unfair competition claim, pursuant to 28 U.S.C. § 1338(b), in that the claim is

joined with a substantial and related claim under the trademark laws of the United States.

3.     This Court has supplemental jurisdiction over the subject matter of Slep-Tone's state law claim pursuant to 28 U.S.C. § 1367(a), in that the claim is so related to Slep-Tone's federal claims that they form part of the same case or controversy.

4.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because all of the Defendants reside in the State of Illinois and the United States District Court for the Northern District of Illinois.

5.     This Court has personal jurisdiction over each Defendant, in that each of them resides in this State and federal judicial district and conducts significant business here, and in that the acts of which the Defendants stand accused were undertaken in this State and federal judicial district.

**THE PLAINTIFF**

6.     Plaintiff Slep-Tone is a North Carolina corporation having its principal place of business in Pineville, North Carolina.

**THE DEFENDANTS**

7.     Defendant Willie Leigh ("Leigh") is an individual that has provided karaoke entertainment to certain venues, including Madd Anthony's Bar & Grill  in Chicago, Illinois. Leigh does business as "Big Ed Productions."

8.     Defendant Lacoco Pizza and Pasta, Inc. ("Lacoco") is an Illinois Corporation that operates a restaurant called Madd Anthony's Bar & Grill  in Chicago, Illinois.  Lacoco Pizza and Pasta, Inc. operates a commercial establishment that provides karaoke entertainment to its patrons as an inducement for their patronage and purchase of food, drink, and other concessions.

**BACKGROUND FACTS**

9.      Slep-Tone is the manufacturer and distributor of karaoke accompaniment tracks sold under the trademark SOUND CHOICE.

10.     Slep-Tone is recognized as a leading producer of high-quality karaoke accompaniment tracks and has invested more than $18 million to re-record and replicate the authentic sound of approximately 18,000 popular songs across different eras and genres of music.

11.     Slep-Tone's dedication to producing music of the highest quality and the most authentic character led to its SOUND CHOICE label being the most recognizable and sought-after in the industry.

12.     Throughout its history, Slep-Tone has released its products for commercial use exclusively on physical media—initially, cassette tapes, and then compact discs beginning in approximately 1994.

13.     Originally, Slep-Tone's compact discs contained karaoke tracks encoded in a special format known as "CD+G," or "compact disc [audio] plus graphics," that allows for synchronized playback of audio and video suitable for prompting singers with lyrics cues.

14.     CD+G discs required special players that were capable of decoding the CD+G format.

15.     More recently, computer technology that allows the karaoke tracks stored on compact discs in CD+G format to be decoded and "ripped" (copied) to a computer hard drive has become widely available.

16.     Copies of karaoke tracks stored on media other than the original compact discs are referred to as "media-shifted copies" because they have been duplicated from the original media and written to non-original media.

17.     Media-shifting also frequently involves format-shifting, the conversion from the original format (such as CD+G) to another format (such as MP3+G or WAV+G).

18.     As the price of computer hard drives of ever-larger size has fallen, professional users now have the technical ability to store a large number of karaoke accompaniment tracks on hard drives for convenient transport to their karaoke shows, without also carrying large numbers of compact discs.

19.     As a result, most professional karaoke operators have shifted to the use of ripped karaoke tracks stored on computer media such as hard drives as a matter of convenience.

20.     However, the same technology is capable of being used not only for convenience but also to allow—on a technical level—the operator to use more music than he or she has paid for and, in some cases, to avoid paying for music at all.

21.     Karaoke operators, like Leigh, have used the available technology to copy one purchased disc to two or more computer systems for simultaneous use; to copy their patrons' discs to the operator's computer hard drive at a show; to "swap" song files with other operators; to obtain and share karaoke tracks via file-sharing sites and torrents; to purchase computer hard drives that were pre-loaded with copies of karaoke tracks; and to sell off their original media in the secondary market once they have ripped those media to a hard drive.

22.     The foregoing activities nearly drove Slep-Tone out of business because it became relatively easy to obtain free, or at a nominal cost, illicit copies of products that would cost tens of thousands of dollars if purchased at retail.

23.     Historically, Slep-Tone opposed the shifting of SOUND CHOICE karaoke tracks to alternative media, warning purchasers of CD+G discs that unauthorized copying was a violation of applicable laws.

24.     Beginning in 2009, Slep-Tone established a media-shifting policy ("MSP") that imposes mandatory rules for karaoke operators who use media-shifted copies of SOUND CHOICE karaoke tracks to provide commercial karaoke services.

25.     Briefly stated, the MSP requires compliance with four conditions: (a) 1:1 ("one-to-one") correspondence, meaning that for every media-shifted SOUND CHOICE karaoke track on a given medium such as a computer hard drive, the operator owns and maintains possession of a lawful original SOUND CHOICE karaoke track on its original medium, on a one-copy-for-one-original basis; (b) that the original media that form the basis for 1:1 correspondence are placed "on the shelf," i.e., not used for any purpose at all; (c) that the operator notify Slep-Tone that he or she has media-shifted karaoke tracks; and (d) that the operator submit to and be certified as having passed an audit of the operator's systems to verify complete compliance with the MSP.

26.     The basis of Slep-Tone's authority to require compliance with the MSP is its right to control the commercial use of its federally registered trademarks and, as to some tracks, its ownership of copyright in the synchronized audiovisual words represented by and in the sound recordings associated with those tracks.

27.     If a karaoke operator complies with all four conditions of the MSP, then that operator is granted permission from Slep-Tone, co-extensive only with Slep-Tone's rights in the subject matter, to use the media-shifted copies to provide commercial karaoke services.

28.     If a karaoke operator fails to comply with any of the conditions of the MSP, then none of the media-shifting the operator has conducted is permitted, authorized, or tolerated by Slep-Tone.

## **THE RIGHTS OF THE PLAINTIFF**

29.     Slep-Tone is the owner of U.S. Trademark Registration No. 1,923,448, issued October 3, 1995, and renewed once, for the trademark SOUND CHOICE, for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions."

30.     Slep-Tone is the owner of U.S. Service Mark Registration No. 4,099,045, issued February 14, 2012, for the trademark SOUND CHOICE, for "conducting entertainment exhibitions in the nature of karaoke shows."

31.     Slep-Tone is the owner of U.S. Trademark Registration No. 2,000,725, issued September 17, 1996, and renewed once, for a display trademark as follows:



for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions."

32.     Slep-Tone is the owner of U.S. Service Mark Registration No. 4,099,052, issued February 14, 2012, for the same display trademark as in the preceding paragraph, for "conducting entertainment exhibitions in the nature of karaoke shows."

33.     Slep-Tone has, for the entire time its marks identified above ("the Sound Choice Marks") have been federally registered, provided the public, including the Defendants with notice of those federal registrations through the consistent display of the symbol ® with its marks as used.

34.     Principally, the Sound Choice Marks are indicators of Slep-Tone as the origin of karaoke accompaniment tracks, meaning that those marks indicate that the tracks to which they are applied were made and distributed by Slep-Tone or at its direction and under its control.

35.     Slep-Tone is the owner of distinctive and protectable trade dress associated with its graphical displays ("the Trade Dress").  This distinctive and protectable trade dress includes, at a minimum, (a) the use of a particular typeface, style, and visual arrangement in displaying the lyrics; (b) the Sound Choice Marks; and (c) the use of particular styles in displaying entry cues for singers, namely a series of vanishing rectangles to indicate the cue.

36.     Slep-Tone has used its trade dress continuously and substantially exclusively for a period of decades.

37.     The individual and collected elements of the Trade Dress have acquired secondary meaning as an indicator of Slep-Tone as a source, effectively functioning as a visual trademark.

38.     The aforementioned trade dress serves to distinguish Slep-Tone's tracks from the tracks of their competitors, such that persons who are even minimally frequent consumers of karaoke entertainment services such as those provided by Lacoco and Leigh are capable of identifying a particular karaoke track as originating with Slep-Tone simply by examining the Trade Dress or any significant portion thereof, whether or not the Sound Choice Marks are also displayed.

39.     The elements of the Trade Dress represent specific design choices by Slep-Tone; they are but three of many ways to convey the information necessary to permit a karaoke singer to be appropriately supported in his or her performance.

40.     No competitor of Slep-Tone is required to use any element of the Trade Dress to accomplish the lyric cueing, and indeed all of the Plaintiff's known competitors are known to use other trade dress in accomplishing the lyric cueing.

**ACTIVITIES OF LEIGH**

41.     Leigh provides karaoke services to various venues in Illinois, principally concentrated in the Chicago metropolitan area, including Madd Anthony's Bar & Grill operated by Defendant Lacoco Pizza and Pasta, Inc.,.

42.     On information and belief, in order to provide services, rather than using original karaoke discs that he possesses (if he indeed possesses such discs), Leigh relies upon one or more computer hard drives that store files representing karaoke accompaniment tracks.

43.     On information and belief, Leigh relies upon at least one such computer hard drive described in paragraph 42 herein.

44.     On information and belief, Leigh created, or directed another to create, or otherwise acquired from a third party the files that are stored on his computer hard drive(s).

45.     On information and belief, Leigh does not maintain a 1:1 correspondence relationship between his hard drives and original discs he might have lawfully acquired.

46.     Slep-Tone did not authorize, cause, control, or know about the creation of the files stored on Leigh's computer hard drives at the time those files were so stored.

47.     On information and belief, many of the files stored on the Leigh's computer hard drives are representative of karaoke tracks originally created by Slep-Tone and are marked with the Sound Choice Marks.

48.     When played as intended using appropriate software, those files cause the Sound Choice Marks and the Trade Dress to be displayed as part of the associated video component of the karaoke tracks they represent.

49.     Slep-Tone did not authorize Leigh to create or use karaoke accompaniment tracks or computer files representative of karaoke accompaniment tracks that bear the Sound Choice Marks or the Trade Dress.

50.     As such, the placement of the Sound Choice Marks and the Trade Dress upon Leigh's computer files is a false designation of the origin of those computer files.

51.     At all times relevant to the causes of action stated herein, Leigh has known that the creation and use of karaoke accompaniment tracks or computer files representative of karaoke accompaniment tracks that bear the Sound Choice Marks and/or the Trade Dress is not authorized.

52.     Leigh's files, which function as karaoke accompaniment tracks, are also counterfeits of genuine SOUND CHOICE-branded tracks.

53.     A patron or unwitting customer of Leigh, when confronted with the display of the Sound Choice Marks and the Trade Dress at one of Leigh's shows, is likely to be confused into believing, falsely, that Slep-Tone created the tracks in use or authorized their creation.

54.     Leigh's use of the computer files representative of karaoke accompaniment tracks is commercial in nature because he is paid to provide access to and play those computer files and tracks at karaoke shows.

55.     Additionally, even if a particular counterfeit track is not played at a given show, the act of making that track available for play at a show is a commercial act for which Leigh is compensated and which inure to his benefit.

56.     On information and belief, Leigh's piracy of accompaniment tracks is not limited to Slep-Tone's tracks, but extends to the piracy of numerous other manufacturers' tracks as well, on the same terms as above.

57.     On information and belief, the Sound Choice Marks were displayed on video monitors during various songs played by Leigh.

58.     Slep-Tone obtained photographs and videos of displays of the Sound Choice Marks.

59.     On information and belief, Leigh has not complied with Slep-Tone's MSP, and therefore his use of the Sound Choice Marks were not authorized proper use.

## ACTIVITIES OF DEFENDANT LACOCO

60.     Lacoco hired Leigh to provide commercial karaoke services at its bar.

61.     Lacoco has the right and ability to control whether its contractors use authentic or counterfeit materials to provide services.

62.     Slep-Tone or its representatives informed Lacoco of the infringing and counterfeit character of Lacoco's contractor's karaoke accompaniment tracks.

63.     Slep-Tone offered Lacoco the opportunity to enter into its Verified Compliance Safe Harbor Program, which is a free program that protects venues from liability for the acts of its contractors in exchange for requiring its contractors to provide information about their karaoke systems to enable Slep-Tone to assess whether those contractors are operating legally.

64.     Slep-Tone also provides a certification program to karaoke operators as a means by which venues can determine, without significant inquiry, whether the karaoke operator they wish to hire is using authentic materials.

65.     As a result of Slep-Tone's efforts, Lacoco has actual knowledge of the infringing and counterfeit nature of Leigh's karaoke materials.

66.     Despite that knowledge, Lacoco refused to terminate Leigh's services.

67.     Despite that knowledge, Lacoco continued to receive a financial benefit from the provision of infringing karaoke services at their establishments by Leigh, through the attraction of paying patrons to their establishments.

68.     As such, Lacoco operated in actual or apparent partnership with Leigh, in a symbiotic relationship from which both benefit.

69.     Lacoco is liable for the acts of trademark infringement directly engaged in by Leigh on their respective premises or for their benefit.

### DAMAGES

70.     Leigh's unauthorized use of Slep-Tone's trademarks has damaged Slep-Tone.

71.     Leigh has enjoyed years of revenues attributable in substantial part to its use of counterfeit SOUND CHOICE-branded karaoke tracks to provide karaoke services for money.

72.     Leigh's illicit activities have also allowed him to compete unfairly against Slep-Tone's legitimate customers by lowering his cost of doing business through piracy of the music materials he uses.

73.     Those illicit activities exerted illegitimate and unfair pressure upon the market for karaoke services in the areas in which Leigh operates by helping to crowd higher-cost but legitimate operators out of the market.

74.     Leigh's acts deprived Slep-Tone of revenue by discouraging legitimate operators from investing in legitimate SOUND CHOICE-branded products.

75.     Lacoco's unauthorized use of and benefit from the use of the Sound Choice Marks have damaged Slep-Tone both in the aggregate and individually.

76.     The Defendants have damaged Slep-Tone in an amount of at least $100,000.

77.     Moreover, by exerting illegitimate and unfair pressure upon the market for karaoke services in this State and judicial district through the use of pirated material belonging to Slep-Tone and to other manufacturers, the Defendants have cost Slep-Tone in excess of

$100,000 in revenue from legitimate sources crowded out of the market by the Defendants' piracy.

## FIRST CLAIM FOR RELIEF
### TRADEMARK AND TRADE DRESS INFRINGEMENT
### AGAINST DEFENDANT WILLIE LEIGH

78.     Slep-Tone repeats and incorporates by reference herein its allegations contained in Paragraphs 1-77 of this Complaint.

79.     Leigh used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress in connection with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress, and by displaying the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress during the provision of those services.

80.     Leigh's use of the Sound Choice Marks was "in commerce" within the meaning of the Trademark Act of 1946 as amended.

81.     Slep-Tone did not license Leigh to make, acquire, or use reproductions, counterfeits, or copies, or to use the Sound Choice Marks in connection with the services provided at his venue(s).

82.     Use of the Sound Choice Marks in the manner attributable to Leigh is likely to cause confusion, or to cause mistake, or to deceive customers at the venues in which Leigh performs into believing that the services those customers are receiving are being provided with the authorization of the Slep-Tone using bona fide, legitimate, authorized karaoke accompaniment tracks.

83.     Leigh's acts were willful and knowing.

84.     Slep-Tone has been damaged by infringing activities of Leigh.

85.     Unless enjoined by the Court, Leigh's infringing activities as described above will continue unabated and will continue to cause harm to Slep-Tone.

## SECOND CLAIM FOR RELIEF
### UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)
### AGAINST DEFENDANT WILLIE LEIGH

86.     Slep-Tone repeats and incorporates by reference herein its allegations contained in Paragraphs 1-85 of this Complaint.

87.     On each occasion when Leigh caused or permitted a Slep-Tone accompaniment track to be played during a karaoke show, Leigh caused or permitted the display of the Sound Choice Marks in connection with Leigh's karaoke entertainment services.

88.     The display of the Sound Choice Marks is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that Slep-Tone sponsored or approved Leigh's services and commercial activities.

89.     The display of the Sound Choice Marks is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by Slep-Tone and purchased by Leigh for use in providing karaoke entertainment services.

90.     Leigh's use of the Sound Choice Marks in this fashion would have inured to the benefit of Slep-Tone if Leigh had legitimately acquired genuine Sound Choice discs instead of

counterfeiting them or acquiring counterfeit copies, in that Slep-Tone would have received revenue from such sales.

91.     Because Slep-Tone has been denied this revenue, it has been damaged by Leigh's uses.

92.     On each occasion when Leigh displayed an accompaniment track pirated from another manufacturer to be played during a karaoke show, Leigh caused the display of the words, names, and symbols of the other manufacturer in connection with Leigh's karaoke services.

93.     The display of these false designations of origin is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the pirated tracks are legitimate, authorized, and authentic materials that Leigh acquired in a legitimate manner.

94.     The display of the false designations of origin is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by those manufacturers and purchased by Leigh.

95.     Leigh's use of the false designations of origin in this fashion damages Slep-Tone by enabling Leigh to provide karaoke entertainment services at a lower cost than persons who acquire those materials legitimately, including Slep-Tone's legitimate customers.

96.     The consequential denial of revenue from a legitimate market for Slep-Tone's customers' services prevents Slep-Tone's customers from making purchases of material from Slep-Tone and is thus a denial of revenue to Slep-Tone.

97.     Because Slep-Tone has been denied this revenue, it has been damaged by Leigh's false designations of origin relating to other manufacturers.

98.     Unless enjoined by the Court, Leigh's unfair competition activities as described above will continue unabated and will continue to cause harm to the Slep-Tone.


### THIRD CLAIM FOR RELIEF
### ILLINOIS DECEPTIVE TRADE PRACTICES ACT
### AGAINST DEFENDANT WILLIE LEIGH

99.     Slep-Tone repeats and incorporates by reference herein its allegations contained in Paragraphs 1-98 of this Complaint.

100.    Leigh used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress in connection with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress, and by displaying the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress during the provision of those services.

101.    Leigh's acts of infringement occurred during the conduct of trade or commerce, from which Leigh derived an economic benefit.

102.    Leigh's acts of infringement constitute unfair or deceptive acts or practices within the meaning of 815 ILCS § 510/1 et seq.

103.    Leigh's acts of infringement cause likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by Slep-Tone.

104.    As a direct and proximate result of each of Leigh's acts of infringement Slep-Tone has suffered a pecuniary loss, including the loss of revenue associated with sales or distribution of compact discs to karaoke jockeys, commensurate with the demand for the

contents of those discs, which revenue would have been received but for Leigh's acts in creating or acquiring counterfeits of Slep-Tone's accompaniment tracks.

105. As such, Slep-Tone has been damaged and is likely to be further damaged by a deceptive trade practice of Leigh within the meaning of 815 ILCS § 510/3.

106. Unless enjoined by the Court, Leigh's unfair competition activities as described above will continue unabated and will continue to cause harm to Slep-Tone.

**FOURTH CLAIM FOR RELIEF**
**COMMON LAW UNFAIR COMPETITION**
**AGAINST DEFENDANT WILLIE LEIGH**

107. Slep-Tone repeats and incorporates by reference herein its allegations contained in Paragraphs 1-106 of this Complaint.

108. Leigh used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress in connection with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress, and by displaying the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress during the provision of those services.

109. Leigh's use of the Sound Choice Marks was "in commerce" within the meaning ascribed by Illinois common law.

110. Slep-Tone did not license Leigh to make, acquire, or use reproductions, counterfeits, or copies, or to use the Sound Choice Marks in connection with the services provided at its night club.

111.     Use of the Sound Choice Marks in the manner attributable to Leigh is likely to cause confusion, or to cause mistake, or to deceive customers at the venues in which Leigh performs into believing that the services those customers are receiving are being provided with the authorization of the Slep-Tone using bona fide, legitimate, authorized karaoke accompaniment tracks.

112.     Leigh's acts were willful and knowing.

113.     Slep-Tone has been damaged by infringing activities of Leigh.

114.     Unless enjoined by the Court, Leigh's infringing activities as described above will continue unabated and will continue to cause harm to Slep-Tone.


**FIFTH CLAIM FOR RELIEF**
**TRADEMARK AND TRADE DRESS INFRINGEMENT**
**AGAINST  DEFENDANT LACOCO**


115.     Slep-Tone repeats and incorporates by reference herein its allegations contained in Paragraphs 1-114 of this Complaint.

116.     Lacoco knowingly directly benefited from the use of, and through Leigh, used a reproduction, counterfeit, or copy of the Sound Choice Marks in connection with the provision of karaoke entertainment services, by displaying and permitting to be displayed the reproduction, counterfeit, or copy of the Sound Choice Marks during the provision of those services.

117.     Lacoco's use of the Sound Choice Marks was "in commerce" within the meaning of the Trademark Act of 1946 as amended.

118.     Slep-Tone did not license Lacoco to make, acquire, or use reproductions, counterfeits, or copies, or to use the Sound Choice Marks in connection with the services provided at its night club.

119.     Use of the Sound Choice Marks in the manner attributable to Lacoco is likely to cause confusion, or to cause mistake, or to deceive Lacoco's customers into believing that the services those customers are receiving are being provided with the authorization of the Slep-Tone using bona fide, legitimate, authorized karaoke accompaniment tracks.

120.     Lacoco's acts were willful and knowing.

121.     Slep-Tone has been damaged by infringing activities of Lacoco.

122.     Unless enjoined by the Court, Lacoco's infringing activities as described above will continue unabated and will continue to cause harm to Slep-Tone.

### SIXTH CLAIM FOR RELIEF
### UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)
### AGAINST  DEFENDANT LACOCO

123.     Slep-Tone repeats and incorporates by reference herein its allegations contained in Paragraphs 1-122 of this Complaint.

124.     On each occasion when Lacoco permitted a Slep-Tone accompaniment track to be played during a karaoke show, Lacoco permitted the display of the Sound Choice Marks in connection with Leigh's karaoke entertainment services.

125.     The display of the Sound Choice Marks is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that Slep-Tone sponsored or approved Lacoco's services and commercial activities.

126.     The display of the Sound Choice Marks is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by Slep-Tone and purchased by Leigh for use in providing karaoke entertainment services in a venue of Lacoco's.

127.     Lacoco's use of the Sound Choice Marks in this fashion would have inured to the benefit of Slep-Tone if Leigh had legitimately acquired genuine Sound Choice discs instead of counterfeiting them or acquiring counterfeit copies, in that Slep-Tone would have received revenue from such sales.

128.     Because Slep-Tone has been denied this revenue, it has been damaged by Lacoco's uses.

129.     On each occasion when Lacoco permitted an accompaniment track pirated from another manufacturer to be played during a karaoke show, Lacoco permitted the display of the words, names, and symbols of the other manufacturer in connection with Leigh's karaoke services.

130.     The display of these false designations of origin is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the pirated tracks are legitimate, authorized, and authentic materials that Leigh acquired in a legitimate manner.

131.     The display of the false designations of origin is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold those manufacturers and purchased by Leigh.

132.     Lacoco's use of the false designations of origin in this fashion damages Slep-Tone by enabling Lacoco, through Leigh, to provide karaoke entertainment services at a lower cost than persons who acquire those materials legitimately, including Slep-Tone's legitimate customers.

133.     The consequential denial of revenue from a legitimate market for Slep-Tone's customers' services prevents Slep-Tone's customers from making purchases of material from Slep-Tone and is thus a denial of revenue to Slep-Tone.

134.     Because Slep-Tone has been denied this revenue, it has been damaged by Lacoco's false designations of origin relating to other manufacturers.

135.     Unless enjoined by the Court, Lacoco's unfair competition activities as described above will continue unabated and will continue to cause harm to the Slep-Tone.

**SEVENTH CLAIM FOR RELIEF**
**ILLINOIS DECEPTIVE TRADE PRACTICES ACT**
**AGAINST  DEFENDANT LACOCO**

136.     Slep-Tone repeats and incorporates by reference herein its allegations contained in Paragraphs 1-135 of this Complaint.

137.     Lacoco hired Leigh to provide commercial karaoke services at its establishment, and it had the right and ability to control his use of authorized or counterfeit materials for said commercial purposes.

138.     Lacoco's permitted Leigh to engage in acts of infringement of the Sound Choice Marks and the Trade Dress, in derogation of Slep-Tone's common law and statutory rights in those marks.

139.     Leigh's acts of infringement occurred during the conduct of trade or commerce, from which Lacoco derived an economic benefit.

140.     Lacoco enabling Leigh's acts of infringement constitute unfair or deceptive acts or practices within the meaning of 815 ILCS § 510/1 et seq.

141.     Lacoco enabling Leigh's acts of infringement caused likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by Slep-Tone.

142.     As a direct and proximate result of each of Leigh's acts of infringement and Lacoco's encouragement thereof, Slep-Tone has suffered a pecuniary loss, including the loss of revenue associated with sales or distribution of compact discs to karaoke jockeys, commensurate with the demand for the contents of those discs, which revenue would have been received but for Leigh's acts in creating or acquiring counterfeits of Slep-Tone's accompaniment tracks.

143.     As such, Slep-Tone has been damaged and is likely to be further damaged by a deceptive trade practice of Leigh, aided by Lacoco's encouragement, within the meaning of 815 ILCS § 510/3.

144.     Unless enjoined by the Court, Leigh's unfair competition activities, aided by Lacoco's encouragement, as described above will continue unabated and will continue to cause harm to Slep-Tone.


**EIGHTH CLAIM FOR RELIEF**
**COMMON LAW UNFAIR COMPETITION**
**AGAINST DEFENDANT LACOCO**

145.     Slep-Tone repeats and incorporates by reference herein its allegations contained in Paragraphs 1-144 of this Complaint.

146.     On each occasion when Lacoco permitted a Slep-Tone accompaniment track to be played during a karaoke show, Lacoco permitted the display of the Sound Choice Marks in connection with Leigh's karaoke entertainment services.

147.     The display of the Sound Choice Marks is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that Slep-Tone sponsored or approved Lacoco's services and commercial activities.

148.     The display of the Sound Choice Marks is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by Slep-Tone and purchased by Leigh for use in providing karaoke entertainment services in a venue of Lacoco's.

149.     Lacoco's use of the Sound Choice Marks in this fashion would have inured to the benefit of Slep-Tone if Leigh had legitimately acquired genuine Sound Choice discs instead of counterfeiting them or acquiring counterfeit copies, in that Slep-Tone would have received revenue from such sales.

150.     Because Slep-Tone has been denied this revenue, it has been damaged by Lacoco's uses.

151.     On each occasion when Lacoco permitted an accompaniment track pirated from another manufacturer to be played during a karaoke show, Lacoco permitted the display of the words, names, and symbols of the other manufacturer in connection with Leigh's karaoke services.

152.    The display of these false designations of origin is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the pirated tracks are legitimate, authorized, and authentic materials that Leigh acquired in a legitimate manner.

153.    The display of the false designations of origin is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by those manufacturers and purchased by Leigh.

154.    Lacoco's use of the false designations of origin in this fashion damages Slep-Tone by enabling Lacoco, through Leigh, to provide karaoke entertainment services at a lower cost than persons who acquire those materials legitimately, including Slep-Tone's legitimate customers.

155.    The consequential denial of revenue from a legitimate market for Slep-Tone's customers' services prevents Slep-Tone's customers from making purchases of material from Slep-Tone and is thus a denial of revenue to Slep-Tone.

156.    Because Slep-Tone has been denied this revenue, it has been damaged by Lacoco's false designations of origin relating to other manufacturers.

157.    Unless enjoined by the Court, Lacoco's unfair competition activities as described above will continue unabated and will continue to cause harm to the Slep-Tone.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Slep-Tone prays for judgment against Willie Leigh and Lacoco that the Court:

A.     Find that Leigh and Lacoco committed acts of infringement, including but not limited to counterfeiting, of the federally registered Sound Choice Marks and of the Trade Dress;

B.     Find that Leigh and Lacoco engaged in unfair competition detrimental to Slep-Tone in violation of 15 U.S.C. § 1125(a);

C.     Enter judgment against Leigh and Lacoco and in favor of Slep-Tone on all applicable counts;

D.     Find the activities of Leigh and Lacoco were in all respects conducted willfully and for profit;

E.     Award to Slep-Tone the profits of Leigh and Lacoco and the damages sustained by Slep-Tone because of the conduct of Leigh and Lacoco in infringing the Sound Choice Marks, the Sound Choice Trade Dress, or both, or, in the alternative, statutory damages per trademark infringed by counterfeiting, and in any event in an amount not less than $50,000 for each establishment in which the infringement occurred, and in the amount of $100,000 from each of the Defendants;

F.     Award to Slep-Tone the profits of Leigh and Lacoco and the damages sustained by Slep-Tone because of Leigh's acts of unfair competition under 15 U.S.C. § 1125(a), and in any event in an amount not less than $50,000 for each establishment in which the infringement occurred, and in the amount of $100,000 from each of the Defendants;

G.     Award to Slep-Tone treble, punitive, or otherwise enhanced damages, as available, for acts of willful infringement by and in the amount of $100,000 from each of the venue Defendants;

H.     Grant Slep-Tone preliminary and permanent injunctive relief against further infringement of the Sound Choice Marks by Leigh and Lacoco;

I.      Award Slep-Tone its costs suit and attorney fees, to the extent not awarded above;

and

J.      Grant Slep-Tone such other and further relief as justice may require.

Respectfully Submitted,

/s/ Vivek Jayaram, Esq.

Vivek Jayaram, Esq.
Jayaram Law Group, Ltd.
33 N. LaSalle Street
Suite 2900
Chicago, IL 60602
vivek@jayaramlaw.com
Tel: 312.454.2859
Fax: 312.551.0322
Counsel for the Plaintiff